Filed 5/6/15  P. v. Perez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B250052 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA126792) |
| v. | |
| LUIS PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. John T. Doyle, Judge.  Affirmed in part with directions and reversed in part.

Lisa Holder, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Luis Perez of attempted second degree robbery in violation of Penal Code sections 664 and 211.[1]  The jury found the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).  Defendant admitted the allegation that he was out on bail when the attempted robbery was committed.  He also admitted having suffered a prior prison term.  The trial court sentenced defendant to a total term of eight years and four months in prison, consisting of the low term of 16 months for the attempted robbery, a consecutive term of two years for the out-on-bail enhancement, and a consecutive five-year term for the gang enhancement.  The court struck the prior prison term enhancement.

Defendant appeals on the grounds that:  (1) the trial court erred by excluding evidence critical to the defense; and (2) the court erred in imposing a DNA fine.

**FACTS**

**Prosecution Evidence**

In August 2012, Wilmer Elias lived on 109th Street in Los Angeles with his mother.  Defendant and his codefendant, Carlos Gallegos, lived on that street also. [2] Elias testified that he had moved back to his mother's home about three months before August 2012.  He had previously lived with his girlfriend, Martha Herrera.[3]  Elias worked for his mother's business.  He had not known defendant or Gallegos before moving in with his mother.

Elias saw defendant every day on the street.  Defendant drove a Monte Carlo with the number "9" on the driver's door.  Defendant once approached Elias and asked him what gang he was from.  Elias had never been in a gang, and he told defendant "none."

---

[1]     All further references to statutes are to the Penal Code unless stated otherwise.

[2]     Gallegos is not a party to this appeal.

[3]     Elias told Officer Ryan Moreno that he had lived on 109th Street for several years. Martha Herrera referred to defendant as her husband but acknowledged they were not legally married.

Defendant told him, "they were the ones that ran everything in the street," and he named something like "Billy Boys." Defendant made a hand sign that looked like a "V."

On August 21, 2012, Elias was walking home from work at approximately 8:30 p.m. with $400 in cash that his mother had paid him. As he walked, Elias was speaking on the phone with a friend, Catalina Mendez. Defendant and Gallegos approached Elias and told him to hand over his wallet, phone, and money. Elias refused to give them up. Gallegos put "something like a gun" to Elias's ribs. Elias was unable to see what it was that was pressed against him. Defendant hit Elias on his mouth, and Elias started fighting with both men. As they were hitting him, they took his money from his right front pocket. His wallet was in his right back pocket, and Elias managed to hold onto it as the two men assaulted him. He felt something hard like metal hit his head, and the two men used their fists and their feet on him while he was on the ground.

Mendez had been walking with Elias before they went in different directions, and she remembered that Elias called her about "two minutes" after they parted ways. She heard screaming at the other end of the line and a female saying, "Stop beating him." She heard a male voice saying "to give them all his belongings." She also heard "some blows" and "scuffling." She looked back and, because of the light on Elias's phone, she was able to see that he was falling. She was frightened because Elias was not answering her when she repeatedly asked what was happening. She hung up and called the police. Because it was dark she could not see who was attacking Elias. She told the 911 operator that "maybe they were Black."

Defendant's family came out of their house, and defendant and Gallegos stopped beating Elias. Defendant's aunt or mother gave Elias a towel. Elias's mother arrived at the scene, and then the police arrived also. Elias had been using his mother's phone, and he did not know what happened to the phone during the assault. Elias returned to his mother's home before the police left. Elias then stated his mother arrived after the police officers. Elias then said that after talking to him, the police officer got in his car and left.

Elias testified that he spoke to the police officers at the scene only for a minute. He told them his phone was taken. He then stated he told them it was lost. He looked for the phone after defendant left but could not find it. He told an Asian officer that

3

defendant and Gallegos took his money. He told the officers that the perpetrators tried to take his wallet but did not succeed. The officer hardly paid attention to Elias and did not write anything down. Elias pointed out defendant's house to the officers, but they did not want to get defendant out. Elias denied telling the officers he did not know where the guys lived and had just seen them around.

Elias was shown some photographs by a police officer, but he could not identify anyone. Elias told the officer about defendant's distinctive car. He also told him the names of his attackers and pointed out to him where they lived. The next time he looked at photographs, Elias identified Gallegos and defendant.

Elias testified that he was using his mother's phone that day, which was a Samsung "phone touch." He and others looked for it but no one found it. Elias denied telling police it was an iPhone—he said only that it was a "phone touch." Mendez testified that Elias had a flip phone.

Elias's mother, Esperanza Elias, went outside to look for Elias because he was late in arriving. She saw him "all bloody" getting up from the ground. She at first stated there was a woman and a young man near him, but then said there was a young girl there with the woman. Elias told her that the men took his phone and his money. She saw defendant and Gallegos cross the street and enter their home.

Elias gave Esperanza his wallet before the police arrived. He told her it had fallen out during the struggle. Esperanza had paid Elias $400 on that day, and she had given him a phone to use. Esperanza testified that she paid her employees on Saturday. It was later stipulated that the attack occurred on a Tuesday. Esperanza denied telling Martha Herrera not to come to court or she would regret it. Esperanza heard the Asian officer at the scene tell her son that he needed a search warrant to go to defendant's residence, and it was not necessary because her son had not been shot.

Detective Ryan Moreno was given the report from the responding officers, Kang and Drury, and there were no names or addresses of suspects in the report. According to the report, the only item stolen was a black iPhone4 with a case, valued at $150. No stolen money was mentioned, and there was no mention of Elias being kicked or pistol-whipped. When Detective Moreno first met with Elias on August 27, 2012, accompanied

by his mother, Elias told him the robbers had fled to an unknown location. Officer Kang's report said Elias did not know where they lived. Elias did not describe being kicked or pistol-whipped to Detective Moreno during their first interview. In Kang and Drury's report, Elias had described the gun used as chrome-colored semiautomatic. Elias never told Detective Moreno that he did not actually see a gun but only felt something.

Detective Moreno made it known to Elias that the detective was trying to figure out who the perpetrators were and where to find them. On the date of the first interview, when Detective Moreno showed Elias the photographic lineups, Elias told the detective that the men who robbed him were not in those pictures. After learning about defendant's car, Detective Moreno was able to identify its owner as defendant's grandmother. Detective Moreno went to her address and obtained defendant's and Gallegos's names. He included their pictures in a photographic lineup, and defendant identified them on October 3, 2012. After identifying the suspects' photographs, Elias left the station without telling Detective Moreno where the suspects lived or that money was taken from him. Detective Moreno did not learn about money being stolen from Elias until the preliminary hearing. At one point, Detective Moreno learned that Esperanza's phone was allegedly returned to her on the night of the incident.

Elias admitted that he pushed Herrera when they were living together. He also broke her phone. Elias denied injuring her and causing red marks and swelling on her face and neck. Elias acknowledged that he had a 2002 conviction for possession of narcotics with intent to sell, a felony. He denied telling Herrera that the allegation that money was taken from him was a lie.

Officer Francis Coughlin testified as a gang expert. The territory of the Hacienda Heights Village Boys gang includes the area of 109th Street and Compton Avenue. The number "9" is significant to the Village Boys gang because they congregate on 109th Street. Coughlin testified about the gang's primary criminal activities. He identified defendant and Gallegos as members of the gang. Officer Coughlin testified that it is common for witnesses and victims to tell different stories at different times because they are afraid to cooperate with the police. They also sometimes lie to get people in trouble. When posed a hypothetical question based on the facts of defendant's case, Officer

5

Coughlin was of the opinion that the crime was committed in association with a gang and that it benefitted the gang.

**Defense Evidence**

Ossiris Hernandez, Gallegos's sister, heard a commotion outside on the night of the incident. She saw her mother and defendant's grandmother separating a fight. She testified that she did not see any part of the fight. They helped a man get up, and he was saying something about a phone. Hernandez obtained a flashlight, and she found the phone and returned it to the mother of the man. The police arrived soon afterwards.

Mayra Gallegos, Gallegos's older sister, passed Elias in the street before the incident. He said some offensive flirtatious words toward her, and she ignored him. Later she saw her mother and defendant's grandmother and Hernandez trying to break up a fight. She heard someone say "he lost his phone." Hernandez borrowed a flashlight and found the phone. She gave it to Elias's mother Mayra knew that defendant and Gallegos were involved in the fight. She told Gallegos to go in the house. She knew that Gallegos and defendant were gang members. Gallegos did not have a gun.

Los Angeles Police Officer Andrew Kang testified that when he and Officer Justin Drury arrived they saw Elias with blood on his face and shirt. There were other people, males and females, around. They spent about 30 minutes at the scene. No one admitted seeing what had occurred. Elias told the officers that two male Hispanics demanded his phone. He did not give any names. One man took out a chrome handgun and pointed it at his stomach. Elias said both men punched him, but he did not say he had been pistol-whipped, kicked, or hit in the head with a gun.

When asked what was taken, Elias mentioned only a cell phone, which he described as a black iPhone4 with a value of $150. Elias said he did not know which way the suspects went. Elias did not say any money was taken. Neither Elias nor his mother pointed to a house across the street and said that the robbers went in that home.

A probation officer, Robert Biglow, telephoned Elias in order to write an investigation report. Elias reported the loss of a cell phone costing $180 and $400 in his wallet. He said he got his identification back. He said his phone was a "cell phone touch."

6

Deputy Stephen Bevan responded to a 2007 spousal battery call in which the victim was Martha Herrera. She had redness and swelling to her neck. With respect to that incident, Herrera testified that Elias hit her, grabbed her by the neck, and pushed her. She could not call the police because he grabbed the phone from her and broke it.

Herrera spoke with Elias after he was attacked, and he told her that even though he had no money on him, he had claimed the robbers stole $400 because he was angry that they hit him. When Herrera told him that was not right, he said he did not care. He also said his mother did not care. After Herrera had appeared in court on this case, Esperanza called Herrera and told her not to go to court or Esperanza was going to pay her back.

## DISCUSSION

### I. Exclusion of Collateral Impeachment Evidence

#### A. *Defendant's Argument*

Defendant contends that the trial court prejudicially erred in foreclosing a line of questioning that was material and relevant and that may have led Elias to give unreliable testimony. The defense then would have impeached Elias with a witness from the police. Thus, the trial court's limitation curtailed an opportunity to cast doubt on the victim's credibility on the critical issue of whether he had a habit of lying to the police.

#### B. *Proceedings Below*

During his cross-examination of Elias, defense counsel asked Elias if he had hit Herrera in the face on April 8, 2007. Elias responded that his fight with Herrera was "only words," and the only thing he did was break her telephone. He denied choking or shoving her. He then admitted pushing her toward the bed, but he denied injuring her. He denied breaking the phone to prevent her from calling the police, claiming he had broken it earlier in the day "because she was talking to a guy." When counsel asked Elias if the police came and spoke with him, the court asked counsel to explain the relevancy of the questioning.

At side bar, defense counsel stated that his purpose was to show defendant lied to the police. Elias told police at the time that he and Herrera had argued over Elias's "baby's momma" and Herrera attacked him. He said he pushed her and left. Counsel wanted Elias to confirm that the argument was about her talking to a man. The

7

prosecutor interjected that it would be like trying another case. The court stated that it would be collateral impeachment, since counsel and the prosecution could go back and forth about what Martha and Elias said to the police. The court agreed with the prosecution that they would be trying another case. The impeachment value lay in Elias's morally turpitudinous conduct, which Elias had already admitted. Despite defense counsel's assertion that there was value in proving to the jury that the instant case was not the first time Elias lied to the police, the trial court ruled that the proffered evidence was collateral.

### C. Relevant Authority

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.) The trial court has wide discretion in determining the relevancy of evidence. (*Ibid*.)

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The trial court has broad discretion under Evidence Code section 352 to exclude collateral impeachment evidence. (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 [trial court has broad power "to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues"]; accord, *People v. Smith* (2007) 40 Cal.4th 483, 512-513.)

A trial court's abuse of discretion is established only by a showing that the discretion was exercised in a manner that is "'arbitrary, capricious or patently absurd'" and resulted in a "'manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

### D. Evidence Properly Excluded

Defendant concedes that the evidence he sought to present was collateral but argues that it would not have been time-consuming or confusing. We conclude otherwise. First, although it may have reflected adversely upon Elias's credibility, the proffered testimony of the police officer involved in the domestic incident between Elias and Herrera was only marginally relevant. Elias was allegedly a perpetrator of domestic violence in the incident with Herrera, whereas he was a victim of robbery in the instant case. If it could be shown that he lied to responding officers after Herrera's complaint, it would have little tendency to create a reasonable inference that he lied or had a motive to lie in the instant case. (See *People v. Garceau*, *supra*, 6 Cal.4th at p. 177.) Any such inference would be speculative, and evidence is not relevant if it leads only to speculative inferences. (*People v. Morrison* (2004) 34 Cal.4th 698, 711.)

Moreover, collateral evidence by definition has reduced probative value and increased tendency to prejudice or to confuse the jury. (*People v. Lavergne* (1971) 4 Cal.3d 735, 742.) Here, any probative value the proffered testimony possessed was substantially outweighed by its effect of creating a trial within a trial and distracting the jury from the principal issues in the instant case. Whether or not Elias lied to the police when questioned about the incident with Herrera had little probative value on the issue of whether he was attacked and robbed by defendant and Gallegos. Elias admitted the incident with Herrera and testified to his version of events, as did Herrera. The two accounts differed, and it was up to the jury to decide who was lying. Herrera's injuries were described to the jury by a sheriff's deputy. Whether or not Elias minimized his conduct to police in 2007 shed no light on the issues in the instant case and was cumulative. This is especially true since it was already obvious from the testimony that Elias gave different versions of the robbery and the surrounding circumstances to different police officers and to the jury, and denied having done so. On the prejudice side of the scale, testimony from a police officer who was at the scene of the 2007 incident between Elias and Herrera would open up the proceedings to more proof on each side on a collateral issue and lead the jury to speculate as to the reason for the in-depth accounting of that distant domestic dispute.

9

Finally, any error in excluding the proffered evidence was manifestly harmless, since the absence of this collateral impeachment would not have produced a significantly different impression of Elias's veracity. (*People v. Smith*, *supra*, 40 Cal.4th at p. 513; see also *People v. Dement* (2011) 53 Cal.4th 1, 52.) Elias was simply not a reliable witness, and his turnabouts in recounting details of the incident were almost dizzying. Some of these have been included in the summary of facts, and defense counsel's argument contains approximately 15 pages recounting the discrepancies in both Elias's and his mother's testimony. Defense counsel extensively cross-examined Elias and his mother about the details of the incident, exposing many internal inconsistencies in their testimony and between their two accounts, as well as between Elias's prior testimony and trial testimony. Counsel's cross-examination of Elias alone consisted of approximately 110 pages of the reporter's transcript. Defense counsel elicited unexplainable omissions in the information Elias provided Detective Moreno for his investigation. The defense also presented affirmative evidence of Elias's questionable information about what was taken in the robbery and the identity of the perpetrators in the form of testimony from the probation officer, Officers Kang and Drury, Herrera, and Gallegos's sisters. In addition, the jury learned that Elias had a prior felony conviction.

The exclusion of evidence that Elias may have lied to police after fighting with Herrera clearly did not prevent defendant from presenting a complete defense or effectively cross-examining Elias, and the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 is not applicable, although cited by defendant. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) Under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, therefore, we conclude that a more favorable result was not reasonably probable absent the claimed error. The jury convicted defendant of attempted robbery rather than robbery, showing that Elias's testimony was effectively impeached. Although defendant posits that the excluded evidence may have "taken the jury all the way over the edge of reasonable doubt," the record does not support this assertion. Mendez testified that she heard Elias being confronted by men, which caused her to call 911. Other witnesses confirmed that Elias was bloody and beaten, and no explanation for an attack other than robbery was offered by the defense, except to briefly

10

mention it "might" be about Elias flirting with Mayra.  The trial court properly exercised its discretion.

## II.  DNA Assessment

### A.  Defendant's Argument

Defendant points out that the trial court imposed a $20 DNA fee at sentencing, and the abstract of judgment shows that a fee of $20 was imposed pursuant to Government Code section 76104.7.  Defendant argues that this Government Code penalty does not apply to restitution fines, court security fees, or court facilities assessments, which constitute the sum total of fines and fees imposed in his case.  Therefore, no fine, penalty, or forfeiture was imposed that supported a DNA penalty under Government Code section 76104.6 or 76104.7, and the fine must be deleted from the judgment.  Respondent concedes this issue.

### B.  Relevant Authority

Government Code section 76104.7, which authorizes imposition of the DNA fee, provides in pertinent part that the fee shall be "levied . . . upon every fine, penalty, or forfeiture imposed and collected by the courts for all criminal offenses."  (Gov. Code, § 76104.7, subd. (a).)  Subdivision (c) of that section provides that the DNA fee does not apply to a restitution fine, any penalty authorized by section 1464 or "this chapter," any parking offense, or the surcharge of section 1465.7.

### C.  Fee Improperly Imposed

The trial court imposed the following fines and fees in defendant's case:  (1) a restitution fine (§ 1202.4, subd. (b)), (2) a parole revocation restitution fine (§ 1202.45), (3) a court "security" assessment (§ 1465.8, subd. (a)), (4) a court construction fee (Gov. Code, § 76000), and the DNA fee in question.

As noted, Government Code section 76104.7, subdivision (c) expressly provides that the DNA fee does not apply to the restitution fines, which would include the parole revocation restitution fine.  In addition, the restitution fine statutes, sections 1202.4 and 1202.45, provide that those fines "shall not be subject to penalty assessments authorized" by "Chapter 12 (commencing with Section 76000) of Title 8 of the Government Code . . . ."

11

The court security (or operations) assessment of section 1465.8, subdivision (a) provides in subdivision (b) of that section that "[t]he penalties authorized by Chapter 12 (commencing with Section 76000) of Title 8 of the Government Code, . . . do not apply to this assessment." (See *People v. Valencia* (2008) 166 Cal.App.4th 1392, 1396.)

The court construction fee is part of the same chapter, Chapter 12, as the DNA fee and therefore cannot be subject to a levy of the DNA fee. (Gov. Code, 76104.7, subd. (c).) Thus, there was no basis for the imposition of a DNA assessment in defendant's case. The assessment must therefore be stricken.

## DISPOSITION

Imposition of the DNA fee is reversed. In all other respects, the judgment is affirmed. The superior court is directed to amend the abstract of judgment to reflect that the DNA fee is stricken and to forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.